UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| TAMMIE S. PITTS,                         ) | |
|                    Plaintiff,           ) | |
| vs.                                                  ) | Cause No. 2:12-cv-39-WTL-WGH |
| MICHAEL J. ASTRUE,                 ) | |
|                    Defendant.        ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Tammie S. Pitts requests judicial review of the final decision of the Defendant Michael J. Astrue, Commissioner of the Social Security Administration (the "Commissioner"), denying her application for Disability Insurance Benefits ("DIB") and Supplemental Social Security Income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"). The Court now rules as follows.

### I.   PROCEDURAL HISTORY

On December 17, 2010, Pitts filed an application for DIB and SSI alleging disability beginning December 19, 2009. Pitts' application was initially denied on February 28, 2011, and again upon reconsideration on April 18, 2011. Thereafter, Pitts requested a hearing before an Administrative Law Judge ("ALJ"). The hearing was held on September 8, 2011, via video conference before ALJ Romona Scales. Pitts and her counsel appeared in Terre Haute, Indiana, and the ALJ presided over the hearing from Valparaiso, Indiana. During the hearing, Leonard M. Fisher, Ph.D., testified as a vocational expert. On September 29, 2011, the ALJ issued a decision denying Pitts' application for benefits. The Appeals Council upheld the ALJ's decision and

denied Pitts' request for review on December 14, 2011. After receiving an extension of time, Pitts filed her action for judicial review.

## II. EVIDENCE OF RECORD

The relevant medical evidence of record follows.

Over the years, Pitts has made a total of sixty-four visits to the emergency room ("ER") as a result of her various physical and mental ailments.[1] Transcript at 24. Between January 4, 2009, and July 7, 2011, alone, Pitts visited the ER thirteen times due to severe migraine headaches. Pitts testified during her hearing before the ALJ that she has suffered from migraines for the last 12-13 years. During the headaches, she experiences throbbing sinus pain, blurred vision, nausea, vomiting, and sensitivity to lights, sounds, and smells. The migraines generally subside only after she receives the powerful analgesic Nubain. Pitts underwent a CT scan of her head and an MRI in March, 2011; however, the tests did not reveal any potential causes for her migraines. Eventually, Pitts began seeking treatment from a clinic, and she received a prescription for the migraine medicine Imitrex. In February, 2011, Pitts reported that, since taking Imitrex, she has experienced fewer migraines and is "usually able to get rid of the migraines easily." Transcript at 25. Pitts, however, continues to experience intense and severe migraines and often seeks treatment in the ER when the Imitrex does not work or is unavailable.[2]

Additionally, Pitts was diagnosed with breast cancer in her left breast in September, 2010. Pitts underwent a left breast lumpectomy in November, 2010, followed by several months

---

[1] Pitts' medical records contain entries noting that her use of the ER is excessive and that she needs to seek treatment through a clinic or a primary care physician. The ER records also indicate that Pitts may be exhibiting drug seeking behaviors and using the ER to obtain prescription pain medication.

[2] The medical records indicate that Pitts reported to her doctors on several occasions that she "ran out" of her prescription pain medication, that her pain medication was stolen, or that she did not know what happened to the medication.

of chemotherapy and then radiation. Pitts has been in remission since June 8, 2011; however, she continues to experience pain in the area of her left arm and shoulder and at the site of her breast cancer surgery. This pain and the resulting limitations affect Pitts' range of motion and her ability to use her left arm and hand. Doctors suggest that the pain and limitations may be due to "cording" stemming from her lumpectomy.[3] Pitts was referred to physical therapy and instructed to begin a home exercise program.

In addition to the foregoing, Pitts also occasionally complains of generalized pain in her back, legs, chest, and hips; shortness of breath; and general discomfort. Pitts also experienced two seizures on August 18, 2011. After several visits to the ER and various tests, however, no etiology has been determined for these conditions.

In February, 2011, Pitts' underwent a physical consultative examination by Tomas Vegas, M.D. Dr. Vegas noted Pitts' complaints of pain, fatigue, malaise, and muscle cramps, but determined that:

> [Pitts] muscle strength was 4/5 throughout, she could stand on her toes and heels, walk in tandem, squat, and lean forward, with all maneuvers noted as slow. [Pitts] had a normal grip strength in both hands (5/5), and a normal range of motion of her thumbs and fingers bilaterally. [Pitts'] left shoulder did have some reduced range of motion, and both her knees and hips were noted as "stiff" and had reduced range of motion.

Transcript at 26. Dr. Vegas summarized that Pitts suffers from left shoulder stiffness, fibromyalgia, panic attacks, and intense, disabling migraines. Dr. Vegas also questioned whether Pitts suffers from osteoarthritis in her hips and knees.[4]

---

[3] "'Cording' can occur after a sentinel lymph node biopsy. Often sufferer's will have rope-like structures, or cords, in the affected arm which makes it difficult for sufferer's [sic] to lift or move the limb." Plaintiff's Brief at 9.

[4] As previously mentioned, however, despite several diagnostic tests, no etiology has been determined for Pitts' hip and knee pain.

In addition to the physical impairments noted above, Pitts also suffers from depression, bipolar disorder, anxiety disorder, and panic attacks. Over the years, she has received prescriptions for Lexapro, Celexa, Wellbutrin, Zyprexa, Risperdal, Ativan, and/or Seroquel to treat her mental ailments. In February 2010, Pitts was voluntarily self-admitted to the Hamilton Center for psychiatric treatment following a suicide attempt. During her in-patient stay, Pitts was diagnosed with major depressive disorder and generalized anxiety disorder with panic attacks. Pitts was discharged from the facility after four days after showing "significant improvement." Transcript at 27. Thereafter, Pitts received treatment for her mental illnesses from non-specialist physicians in the form of prescription medication.

In February 2011, Pitts underwent a consultative psychological examination with Howard E. Woodson, Ph.D. Dr. Woodson confirmed that Pitts suffers from major depression and chronic panic disorder, but that her "overall cognitive functioning seems to be intact." Transcript at 28. Dr. Woodson also reported that Pitts admitted to prior methamphetamine use.

That same month, J. Gange, Ph.D., reviewed Pitts' medical records and completed a mental residual functional capacity ("RFC") assessment. Dr. Gange found that Pitts was moderately impaired in her ability to:

- Maintain attention and concentration for extended periods;
- Perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;
- Complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.
- Interact appropriately with the general public;

- Respond appropriately to changes in the work setting; and
- Set realistic goals or make plans independently of others.

Transcript at 653-54. Despite Pitts' mental impairments and moderate limitations, Dr. Gange opined that Pitts retained the "ability to do simple work on a sustained basis." *Id*. at 655.

Shortly thereafter, Pitts was referred by her oncologist to psychiatrist John Gonzalez, M.D. Dr. Gonzales regularly noted during Pitts' visits that she was depressed and that she suffers from bipolar disorder. Dr. Gonzalez prescribed Seroquel and Ativan to treat Pitts' mental impairments. As of June 9, 2011, the last visit noted in the medical records, Dr. Gonzalez reported that

> [Pitts] has been doing better. Sleep, energy, mood, and appetite appeared to be good, but again had been under considerable stress due to financial constraint. [Pitts] is still having some anxiety as a result of that. . . . Affect is appropriate. Mood is anxious, but better. No suicidal or homicidal ideation. No signs or symptoms of psychosis. Concentration and memory is good. Insight and judgment is good.

Transcript at 929. Pitts, however, continues to experience anxiety and panic attacks and has difficulty sleeping, periodic auditory and visual hallucinations, focus issues, problems relating to others and being in public, and racing thoughts.

### III.   APPLICABLE STANDARD

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d) (1)(A). In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work, but any other kind of gainful employment that exists in the national economy, considering his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, he is not disabled, despite his medical condition and other factors. 20 C.F.R. § 404.1520(b).[5] At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits his ability to perform basic work activities), he is not disabled. 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 404.1520(d). At step four, if the claimant is able to perform his past relevant work, he is not disabled. 20 C.F.R. § 404.1520(f). At step five, if the claimant can perform any other work in the national economy, he is not disabled. 20 C.F.R. § 404.1520(g).

On review, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.,* and this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue,* 546 F.3d 456, 462 (7th Cir. 2008). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). In order to be affirmed, the ALJ must articulate his analysis of the evidence in his decision; while he "is not required to address every piece of

---

[5]The Code of Federal Regulations contains separate sections relating to DIB and SSI that are identical in all respects relevant to this case. For the sake of simplicity, this Entry contains citations to DIB sections only.

evidence or testimony," he must "provide some glimpse into [his] reasoning . . . [and] build an accurate and logical bridge from the evidence to [his] conclusion." *Id.*

## IV. THE ALJ'S DECISION

At step one, the ALJ found that Pitts has not engaged in substantial gainful activity since her alleged onset date of December 19, 2009. At step two, the ALJ concluded that Pitts had the following severe impairments: status-post breast cancer; left shoulder pain; migraine disorder; depressive disorder; generalized anxiety disorder; and bipolar disorder. At step three, the ALJ determined that Pitts' severe impairments did not meet or medically equal a listed impairment. At step four, the ALJ concluded that Pitts had the RFC to perform light work with the following limitations:

> [N]o more than occasional stooping, crouching, crawling, kneeling, balancing, and climbing of ramps and stairs; further, the claimant is limited to no climbing of ropes, ladders, or scaffolds; additionally, the claimant is limited to simple routine work on a sustained basis, the claimant is able to maintain adequate attention to perform work on a sustained basis; however, the claimant is limited to no more than brief and superficial contact with the public; finally, the claimant is limited to no more than frequent handling and fingering with the upper left extremity, and no more than occasional reaching, with the upper left extremity.

Transcript at 23. Pitts, however, could not perform any past relevant work. Given the RFC finding, and taking into account Pitts' age, education, and work experience, the ALJ determined at step five that Pitts could perform jobs existing in significant numbers in the national economy, those being an inspector, an encapsulator, and a wire prep machine tenderer. Accordingly, the ALJ concluded that Pitts was not disabled as defined by the Act from December 19, 2009, through the date of her decision (i.e., September 29, 2011).

## V. DISCUSSION

Pitts advances numerous objections to the ALJ's decision; each is addressed below.

### A. Hypothetical and Vocational Expert's Response

7

Pitts argues that the jobs identified by the vocational expert do not take into account her physical limitations. Pitts also argues that the ALJ failed to provide the vocational expert with an appropriate hypothetical. This Court agrees that the hypothetical and the vocational expert's response require additional clarification.

*1. Jobs Identified by the Vocational Expert*

Despite the ALJ's finding that she is limited to occasional reaching with the upper left extremity, Pitts argues that the jobs identified by the vocational expert require frequent bilateral reaching. The Commissioner does not dispute that the jobs identified by the vocational expert (i.e. inspector, encapsulator, and wire prep machine tenderer) require frequent reaching. The Commissioner argues, however, that Pitts "is only limited to occasionally reaching with her left arm, while her right [arm] remains unimpaired. . . . [N]one of the identified jobs requires frequent reaching *bilaterally*." Defendant's Brief at 18 (emphasis in original). This Court, however, is unable to determine from the vocational expert's testimony at the hearing or the descriptions in the *Dictionary of Occupational Titles* whether the jobs require frequent bilateral reaching. As such, this matter must be remanded to the Commissioner. On remand, the ALJ should clarify whether the jobs identified by the vocational expert comport with Pitts' physical limitations.

*2. Moderate Limitations in Concentration, Persistence, and Pace*

Pitts further argues that she has moderate limitations in concentration, persistence, and pace, but that those limitations were not included in the hypothetical given to the vocational expert. This Court agrees that further clarification or a new hypothetical is required.

The Seventh Circuit has repeatedly held that a hypothetical "must account for documented limitations of 'concentration, persistence or pace.'" *Stewart v. Astrue*, 561 F.3d 679,

8

684 (7th Cir. 2009) (citations omitted). Here, based on the findings of Dr. Gange, the ALJ specifically found that Pitts "possesses moderate difficulties in her ability to maintain concentration, persistence, and pace." Transcript at 22. The ALJ, however, did not include this limitation in her hypothetical. Further, this Court is unable to determine how, if at all, the ALJ reconciled Pitts' moderate limitations in concentration, persistence, and pace with the finding that Pitts "is able to maintain adequate attention to perform simple routine work." Transcript at 23. Accordingly, on remand, the ALJ must account for Pitts' moderate limitations of concentration, persistence, and pace in relation to the hypothetical.

### B. RFC Determination

Pitts also challenges the ALJ's RFC determination. An RFC evaluation "is an administrative assessment of what work-related activities an individual can perform despite her limitations. . . . In assessing the claimant's RFC, the ALJ must consider both the medical and nonmedical evidence in the record." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) (citations omitted). Pitts argues that the ALJ made an erroneous RFC determination in her case because (1) she failed to properly consider Pitts' severe impairments in combination as required by case law and 20 C.F.R. § 404.1523; (2) she did not adequately consider the "nature" of Pitts' migraines; (3) she did not consider the "episodic nature" of all of Pitts' mental health diagnoses; and (4) the ALJ should have found that Pitts suffers from additional limitations.

#### *1. Combination of Impairments*

An ALJ is required to "consider the aggregate effect of [a claimant's] entire constellation of ailments–including those impairments that in isolation are not severe." *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) (noting that "a competent evaluation of [a claimant's] application depends on the total effect of all his medical problems").

9

Pitts takes issue with the ALJ's decision because the ALJ did not discuss the effect Pitts' mental ailments have on her ability to comply with her treatment regimen.[6] Pitts argues that "the Seventh Circuit has found reversible error where the ALJ failed to consider the role that [a] Plaintiff's mental illnesses played in treatment compliance," especially when noncompliance is noted by the ALJ. Plaintiff's Brief at 15 (citing *Kangail v. Barnhart*, 454 F.3d 627 (7th Cir. 2006)). This Court agrees that the ALJ should have discussed the interplay between Pitts' mental illnesses and her apparent inability to comply with her treatment protocol.

In *Kangail*, the claimant suffered from bipolar disorder, but also had a history of drug and alcohol abuse. The ALJ determined that "when the plaintiff stopped abusing alcohol and drugs . . . . her condition improved and she was able to work, at least when she took her medication prescribed for her mental illness." *Kangail*, 454 F.3d at 628. As a result, the ALJ denied her application for benefits. The Seventh Circuit reversed the decision, noting that even after the claimant stopped abusing drugs and alcohol, she was unable to hold a job because of her manic and depressive episodes. The Seventh Circuit further reasoned as follows:

> The [ALJ] thought the plaintiff's inability to hold a job unimportant because she could work when she took her medicine. And it is true that bipolar disorder is treatable by drugs. But mental illness in general and bipolar disorder in particular . . . may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment. . . . The [ALJ] did not consider this possibility.

*Id.* at 630-31. Thus, the court faulted the ALJ for not considering the effect the claimant's bipolar disorder had on her ability to comply with her treatment.

Although *Kangail* is distinguishable from the present case, the ALJ did call into question Pitts' apparent inability to comply with her treatment regimen. The ALJ, however, did not

---

[6]As noted above, Pitts reported to her doctors on several occasions that she "ran out" of her prescription pain medication, that her pain medication was stolen, or that she did not know what happened to the medication. The ALJ took note of this in her decision and inferred that Pitts is unable to comply with her treatment regimen.

discuss whether Pitts' mental illnesses played a role in her noncompliance. Here, the ALJ used Pitts' inability to maintain her supply of prescription medication to imply that Pitts' may be using excuses to obtain prescription pain medication. While such an inference is entirely permissible, the ALJ should have discussed the effect (if any) Pitts' multiple mental illnesses have on her ability to comply with her treatment protocol. In other words, are Pitts' mental illnesses to blame for her noncompliance? On remand, the ALJ should remedy this problem and discuss the interplay between Pitts' mental illnesses and her apparent inability to comply with her treatment protocol.

The Court also notes that the ALJ considered Pitts' failure to comply with her treatment against her in relation to her credibility determination. Pitts argues that this was improper. Plaintiff's Brief at 16. As this Court discussed above, the ALJ should have discussed whether Pitts' mental illnesses played a role in her inability to maintain her supply of prescription pain medication. If that discussion impacts her credibility determination, the ALJ should reassess Pitts' credibility.

### 2. *Nature of Migraine Headaches*

Pitts also contends that the ALJ did not properly consider the nature of Pitts' migraine headaches. Specifically, Pitts believes that the ALJ's reliance on the "normal" results of a CT scan and an MRI was not proper. Pitts argues that "the ALJ failed to understand that these tests are used as a means to exclude other serious medical conditions and not to diagnose migraines, something that neither of these objective tests are capable of doing." Plaintiff's Brief at 14.

The ALJ's decision, however, simply mentions the tests and their results. The ALJ did not rely solely on these findings to support her RFC determination or her opinions regarding Pitts' migraines. Rather, the ALJ discussed at length Pitts' subjective complaints and the medical

11

records from her numerous visits to the ER relating to her migraine headaches. The ALJ's discussion, which acknowledged the recurrence of the headaches and included Pitts' complaints of blurred vision, nausea, vomiting and sensitivity to lights, sounds, and smells and reflects that the ALJ understood and properly considered the nature of Pitts' migraines.

With regard to Pitts' use of Imitrex, Pitts also argues that the ALJ should be faulted for failing "to acknowledge that even after [Pitts] began using Imitrex and experienced some improvement in her migraines, she frequently ended up in the ER when the medication failed to prevent breakthrough pain." Plaintiff's Brief at 14. The ALJ, however, "is not required to address every piece of evidence or testimony" in the record. *Scheck*, 357 F.3d at 700. Moreover, the ALJ noted that Pitts continues to experience migraines. *See* Transcript at 25. Thus, this fact is not crucial to the ALJ's RFC determination.

3. *Episodic Nature of Mental Illnesses*

Pitts also summarily claims that the ALJ did not properly consider the episodic nature (i.e., the waxing and waning) of her mental health illnesses. The ALJ's discussion of the medical evidence, however, reflects that the ALJ understood the episodic nature of Pitts' depression, anxiety, and bipolar disorder. Indeed, the ALJ reviewed Pitts' medical records specifically looking for and noting episodes of decompensation, depression, and panic attacks.[7] Transcript at 21-22; 28. The ALJ also noted Pitts' fluctuating Global Assessment of Functioning ("GAF") scores.[8] In light of the foregoing, this Court finds that the ALJ understood and properly considered the episodic nature of Pitts' mental illnesses.

---

[7]In fact, such a review was necessary for the ALJ to determine whether Pitts' impairments met or equaled one of the listed impairments.

[8]GAF "is a numeric scale used by mental health professionals to subjectively rate the social, occupational, and psychological functioning of adults. The GAF scale rates an individual

12

*3. Additional Limitations*

Pitts also argues that the ALJ should have accounted for additional limitations in her analysis and included the additional limitations in her hypothetical to the vocational expert. Specifically, Pitts believes that she will require future absences from work due to her emergency room visits, and that she has moderate limitations in social functioning with regard to supervisors and co-workers in her analysis. These limitations, however, are not supported by the evidence in the record.

With regard to Pitts' emergency room visits, the ALJ stated the following:

> The claimant's medical records . . . indicate that as of December 6, 2010, the claimant had seven (7) non-urgent visits to the emergency room for the year, and that in 2009, the claimant had nine (9) visits, with a total of sixty-four (64) reported over the years. . . . The medical reports specifically state that this is an excessive use of the ER and that the claimant needs to get help through a clinic or her primary care physician; additionally, there appears to be questions by the medical staff of whether or not the claimant [is] . . . seeking other narcotics.

Transcript at 24. Because the ALJ concluded that Pitts' need for frequent hospitalizations was not supported by the medical evidence, the ALJ was not required to include frequent absences from work as a limitation in the hypothetical given to the vocational expert. *See Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007) (An "ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible.").

Further, Pitts testified during the hearing that she has no "problems getting along with family, friends, neighbors, or authority figures, and that she has never been fired or laid off from a job because of problems getting along with other people." Transcript at 22 Dr. Gange also concluded that Pitts was "not significantly limited" in "[t]he ability to accept instructions and respond appropriately to criticism from supervisors," and "[t]he ability to get along with

---

from 1-100 and can be found in the *Diagnostic and Statistical Manual of Mental Disorders 4*[th] *Ed.* (DSV-IV)." Transcript at 27, n. 1.

13

coworkers or peers without distracting them or exhibiting behavioral extremes." Transcript at 654. Accordingly, such a limitation is not supported by the evidence, and thus, was not required in the hypothetical.

### C. Weight Accorded to Treating Psychologist

Lastly, Pitts argues that the ALJ did not provide a rationale for favoring the opinions of the non-examining reviewing physicians over the reports of Pitts' treating psychologist, Dr. Gonzalez. However, the ALJ found and this Court agrees that the opinion of Dr. Gonzalez was not inconsistent with the opinions of the non-examining physicians.[9] Accordingly, the ALJ did not reject the treating physician's opinion, such that she was required to provide a rational for favoring one opinion over the other.

### VI. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is **REVERSED** and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this Entry.

SO ORDERED: 03/07/2013

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.

---

[9]The ALJ noted the following in her decision:

> As to the assessments made by State agency psychological consultants, J. Gange, Ph.D. and Joseph A. Pressner, Ph.D.,[9] the undersigned affords them great weight. The consultants assessed the claimant able to do simple work on a sustained basis with decreased socialization and poor stress tolerance. The consultants' assessments remain appropriate and supported by the medical evidence; specifically, the progress made by the claimant while under the care of Dr. Gonzalez.

Transcript at 30.

14